THE NELSON VITRIFIED BRICK COMPANY V. MRS.
ISAAC W. MUSSULMAN.

No. 15,604.   (99 Pac. 236.)

SYLLABUS BY THE COURT.

MASTER AND SERVANT—*Injury to Employee—Assumption of Risk
—Contributory Negligence.* An employee of a brick manu-
facturer was killed by a wall in course of construction falling
upon him. His widow sued to recover damages, alleging neg-
ligence of the defendant in the construction of the wall,
whereby the place in which the employee worked became un-
safe. The defense was based mainly upon an alleged as-
sumption of risk by the employee, and upon his contributory
negligence. The jury found for the plaintiff upon both of
these matters. *Held:* (1) That the findings of the jury ap-
proved by the district court, if sustained by competent evi-
dence, must stand; (2) that the findings were sustained by
the evidence; (3) that a demurrer to the evidence was prop-
erly overruled.

Error from Labette district court; THOMAS J. FLAN-
NELLY, judge. Opinion filed November 7, 1908. Af-
firmed.

*Kimball & Osgood,* and *John Madden,* for plaintiff in
error.

*M. E. Williams,* and *W. D. Atkinson,* for defendant
in error.

The opinion of the court was delivered by

BENSON, J.: Isaac W. Mussulman, an employee of
the Nelson Vitrified Brick Company, was injured by
the falling of a wall of a brick-kiln where he was at
work, causing his death. His widow commenced an ac-
tion to recover damages for the alleged negligence of
the company whereby her husband lost his life, and
recovered.

The petition alleged negligence of the brick company,
August Nelson, superintendent of the plant, and W. R.
Taylor, foreman of the gang in which the deceased was

working, in the following matters: The construction of a soft-earth foundation for the wall; the construction of the wall from green brick; permitting water to collect and stand on the soft ground inside of the wall; constructing the wall without support; and in directing the deceased to work in an unsafe and dangerous place.

The answer admitted that the deceased was defendant's servant in a gang of workmen under the control of a foreman who was a fellow servant of the deceased; that the wall was built of green brick, upon a recently filled foundation; that the attention of the foreman was called to the condition of the wall the day before and on the morning it fell; that he was informed that it was leaning and settling; and that he knew that it was unsafe and that the foundation was settling and giving away. The answer contained a general denial, and also charged contributory negligence, alleging that for many hours before the wall fell it had settled and was leaning to such an extent that it had become unsafe and dangerous to work at the place where the injuries occurred, and that this dangerous condition was evident and obvious to all who were near it; that the attention of the men had been called to this condition; that the foreman warned the deceased and other workmen of this unsafe and dangerous condition, and that the deceased voluntarily placed himself in such a position that when the wall fell he was injured as the result of his own negligence. The reply was a general denial.

At the time of the injury the company was engaged in constructing the walls of a new kiln, and also setting bricks in the kiln to be burned. The plant was a newly constructed one and had no burned bricks, and the bricks used in constructing the outer walls of the kiln were green brick—dried, but not burned—among which were many broken pieces, or bats. The work of building these walls was being done by unskilled laborers, under the direction of W. R. Taylor, a skilled and experienced workman, who was foreman of the "setting gang" in which the deceased was working. Ten or

twelve men were working in the gang at the time. The kiln was located on a newly made fill, excavated from a hillside in leveling the ground upon which to erect the kilns. The south wall of the kiln was first constructed. The east and west walls were being built in advance of the work of laying the bricks in the arches for burning, inside of the kiln, which supported these walls so far as the arches had been laid. The west wall extended northward some fifteen or twenty feet beyond this support; it was about twelve feet high, about thirty-four inches thick at the base, and sixteen inches at the top, being drawn in from the outer, or west, side. It was crooked, and leaned to the east. Rain had recently fallen, and water had collected within the area of the kiln under construction, and, standing there, had saturated the ground under and inside the west wall, then being built. The two lower courses of this wall were of hard brick, but the saturation and consequent softening of the newly made ground caused the wall to settle so that the water came in contact with and softened the green bricks in the courses above. A workman was laying bricks upon this west wall, which was then considerably out of plumb. Green bricks had been brought in on a car from the dry-house, and one man was pitching them from this car, which stood seven feet from the west wall, to another, who passed them on to the man on the wall. Another workman was pitching bricks from this car to Mussulman, who in turn pitched them along to the foreman, who was laying them in the arches, or kiln, a few feet south of Mussulman, who, in doing this work, was standing between the car and the wall. While in this position the wall fell upon him, causing the injuries of which he died.

The superintendent of the plant testified as follows:

"Ques. You say this wall was dangerous? Ans. Yes; and I knew if it rained it was going to fall.

"Q. You knew it rained that night? A. Yes, sir.

"Q. You knew that day the danger to it? A. Yes, sir."

51—78 KAN.

"Q. You knew they were to go to work there at seven o'clock? A. Yes, sir.

"Q. You knew that the men would go to work where that wall was? A. Yes, sir.

"Q. Yet you did n't send orders down, or go yourself to look after it? A. There was the foreman there to attend to that business.

"Q. Who was the foreman? A. Taylor was the foreman for the building of the kiln and starting it up, and Sherman was the general foreman over the yard.

"Q. Did Taylor have full charge? A. Of that kiln; yes, sir."

"Q. You say also that the wall was leaning? A. Yes, sir.

"Q. Then you had a wall that was built by inexperienced men, and it was built by green brick, many of them bats, and it was upon a soft-earth or new-made foundation, and it had recently rained, and you had all those conditions affecting that wall, had n't you? A. Yes, sir.

"Q. These brick were all green brick; brick that had never been kiln burnt, but simply came out of the dryer, made in the drying-machine and brought out without burning? A. Yes, sir.

"Q. And if you apply moisture to them they will simply squash and melt down? A. Yes, as soon as it rains on them. We had two courses of burned brick at the bottom, but the rain was so heavy the moisture went to the upper brick and softened them over.

"Q. Is n't it a fact the weight of the green brick on the top of this kind of new-made earth foundation sunk them down level with the bed of the kiln, so the water came in on them and wet the third course? A. Yes, sir."

The defective condition of the wall being conceded, and notice to the company, if not admitted, being shown, the principal issues tried were upon the defendant's allegations that the deceased assumed the risk and was guilty of contributory negligence. In answer to special questions the jury found that Mussulman was without experience in the construction of such walls; that he did not know that the wall was in a dangerous condition; and that such dangerous condition was not obvious to a man of ordinary intelligence. While the

wall was a poorly constructed affair, both in material and workmanship, and was leaning, and the ground about it was water-soaked, other workmen continued their work in dangerous proximity, and testified that they apprehended no danger. The foreman on cross-examination testified that he would not have continued work there if he had known that it would fall, and would have told the boys to get out. It is true that he testified that he told the men the wall was leaning and to look out, but he also said this was intended as a joke, as appears from his testimony:

"Ques. I want you to say to the jury whether you were joking when you told the men they had better look out for that wall; or were you in earnest? Ans. I was joking.

"Q. I want to know whether you were joking when you went to Sherwood and told him you considered the wall dangerous? A. No.

"Q. Were you joking, or in earnest then? A. I was talking business then.

"Q. Why would you be in earnest when you were talking to Sherwood and joking when you told the men they had better look out? A. Simply because if I had told them the plain truth about it they would not work and I would have been out of men; that would be all— they would quit."

It is claimed that the crude appearance of this wall was such as to lead to jocular remarks concerning it. But whether they were made in jest or earnestness was for the jury to determine. The defendant argues that the dangerous conditions were so obvious that it must be held that Mussulman assumed the risk. The opinion in *Walker v. Scott*, 67 Kan. 814, is cited to sustain the contention that the foreman had no knowledge superior to that of the deceased, and that with all the means of knowledge that his superiors had he voluntarily encountered the danger. In the Walker case the injured person was not only aware of the danger but had on several occasions expressed his fear that a cave-in would occur—that it was unsafe, and that some one

would be hurt. Nothing of the kind appears here. The only knowledge attributable to Mussulman is to be inferred from the appearances surrounding him, the conversation of the workmen, and the general knowledge that we must presume he possessed. The dangers were not so apparent as to deter others, nor such as to cause the superintendent or the yard foreman, both of whom had full knowledge of the situation, to take steps to protect their men. And the foreman of this particular gang, a man of experience, upon whom the superintendent says he relied, continued to work and permitted the others to work close to this dangerous wall. With all the evidence before them the jury found that the danger was not obvious to persons of ordinary intelligence. This finding, supported as it is by competent evidence and approved by the district court, can not be set aside by this court.

It is doubtful whether the doctrine of assumed risk properly applies in this case. (*Railway Co. v. Loosley,* 76 Kan. 103, 90 Pac. 990.) It may not be important to decide whether the circumstances relied upon to show an assumption of risk are appropriate to that head or to that of contributory negligence, for the latter defense was also relied upon and must be considered. Here, too, the jury found against the defendant's contentions, as will appear from the general verdict and from the following special findings:

"(19) Ques. Do you find from the evidence that at the time Isaac W. Mussulman sustained injury he knew the dangerous condition of said brick wall? Ans. No.

"(20) Q. Do you find from the evidence that at the time Isaac W. Mussulman sustained injury he was exercising ordinary care to prevent injury to himself? A. Yes."

"(7) Q. Did Taylor, the foreman of the setters, tell the men who were working with him that the wall was unsafe or dangerous? A. No."

The jury having found that the deceased exercised ordinary care and that he was not guilty of contributory negligence, we have only to consider whether such

findings are supported by the evidence. We have already referred to and quoted some of this evidence. The jury had presented to them the condition of the ground; the manner of the construction of the wall and the materials used; the fact that rains had just fallen; the effect of the water upon the wall; its appearance some time before and at the time it fell, and the appearance of the ruins remaining; the conduct and conversation of the gang foreman and of fellow workmen; and the notice to, and conduct of, the superintendent and of the yard foreman. From all this, and all the other circumstances in evidence, which have been duly considered, the jury found that the deceased was free from contributory negligence; and this finding, based on competent evidence, must, with the other findings, be sustained upon principles so often stated that repetition here is useless.

For the same reasons the order overruling the demurrer to the evidence is approved. No complaint is made of the instructions or the incidental rulings of the court, nor of the findings of negligence of the defendant.

The judgment is affirmed.